IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| TAMEKA WALKER, | ) | Civil Action File No.: 1:25-CV-00100 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF LAW IN** |
| v. | ) | **SUPPORT OF DEFENDANTS' MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| DEPUTY MICHAEL MORTON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

NOW COME Defendants Michael Morton, Joseph Hawkins, Bryan Mealing, Leslie Gaiter, and Sheriff Eugene Brantley ("Defendants"), and file this Memorandum of Law in Support of their Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

This case arises from a traffic stop and arrest that occurred on September 13, 2023 at 3:25 p.m. Plaintiff was leaving a convenience store and driving to MCG to pick up her son (Exh. "A" – Depo. of Pl. at p. 11.) As plaintiff exited the convenience store, she entered the far left turn lane to make a U-turn to travel towards Windsor Springs Road. (Id.) At this point, Deputy Morton initiated a traffic stop of plaintiff's vehicle for excessive window tint. (Id.; Exh. "B" – Decl. of Morton at ¶ 3 and Decl. Exh. 1.) Upon approaching plaintiff's vehicle, Deputy Morton informed plaintiff that he stopped her for the window tint on the vehicle. (Exh. "A" – Depo. of Pl. at p. 36.) Deputy Morton asked plaintiff if she knew what the tint was on the windows, but she did not. (Id.) At this point, Deputy Morton asked for plaintiff's license, which plaintiff provided, and Deputy Morton returned to his vehicle to perform a routine records check on plaintiff and verify her driver's license, insurance and registration of the vehicle. (Exh. "A" – Depo. of Pl. at pp. 12, 15; Exh. "B" - Decl. of Morton at ¶ 4 and Exh. 1.)

Within a minute or two of the initial stop, Deputy Hawkins with the K-9 task force arrived on scene with his narcotics-detection K-9, Gajes. (Exh. "A" – Depo. of Pl. at pp. 12, 42; Exh. "C" – Decl. of Hawkins at ¶ 3 and Exh. 1.) Around the same time, Deputy Mealing arrived on scene. (Exh. "A" – Depo. of Pl. at p. 12; Exh. "D" – Decl. of Mealing at ¶ 3.) On the date in question, both Deputy Hawkins and Gajes were certified in narcotics detection to detect odor of methamphetamine and marijuana, among others odors. (Exh. "A" – Depo. of Pl. at pp. 49-50; Exh. "C" – Decl. of Hawkins at ¶ 8 and Exh. 2.) Deputy Hawkins and Gajes were extensively trained in narcotics odor detection, having received over 500 hours of training for detection and recognition of narcotics odors. (Exh. "C" - Dec. of Hawkins, ¶ 9.)

While Deputy Morton was in his vehicle performing the routine records check and verifying plaintiff's information, Deputy Hawkins deployed Gajes to conduct an open-air sniff around the exterior of plaintiff's vehicle. (Exh. "A" – Depo. of Pl. at p. 42; Exh. "B" – Decl. of Morton at ¶ 4; Exh. "C" – Decl. of Hawkins at ¶ 4.) The K-9 open air sniff occurred within two minutes of the traffic stop beginning. (Exh. "A" – Depo. of Pl. at pp. 42.) When the open air sniff occurred, Deputy Morton had not completed the records check and verification of plaintiff's information. (Exh. "B" – Decl. of Morton at ¶ 5 and Exh. 2.)

During the open air sniff, Gajes displayed a trained final response on the right side of plaintiff's vehicle by becoming rigid in his stance and coming to a final alert, a sit, indicating the presence of the odor of narcotics. (Exh. "C" – Decl. of Hawkins at ¶ 5 and Exh. 1.) This alert was observed by both Deputy Hawkins and Corporal Mealing. (Id.; Exh. "D" – Decl. of Mealing at ¶¶ 4-5.) Based on this alert, deputies searched plaintiff's vehicle. (Exh. "B" – Decl. of Morton at ¶ 6.) The search revealed a white, powdery substance that field tested positive for methamphetamine and two pills identified as oxycodone contained in Plaintiff's purse and approximately 20 grams

of marijuana found under the driver's seat. (Id. at 7.) Plaintiff was arrested and transported to the detention center, where she was charged with felony possession of methamphetamine, felony possession of oxycodone, and cited for a window tint violation. (Id. at 11-12 and Exh. 1 and 2.) Plaintiff was not charged for possession of marijuana by Deputy Morton. (Id. at 12.)

Plaintiff bonded out two days after her arrest. (Exh. "A" – Depo. of Pl. at pp. 13.) She was subsequently indicted for felony possession of methamphetamine, felony possession of oxycodone, misdemeanor possession of marijuana, and window tint violation. (Id. at 55-56.) Plaintiff was never charged with a felony related to the marijuana found in the vehicle. Id. All criminal charges against Plaintiff were subsequently dismissed by the prosecutor. Id. at 64.

Plaintiff filed the present action, *pro se*, on April 28, 2025. (Doc. 1.) Plaintiff filed an amended complaint on May 23, 2025, and after screening by the Court, claims were allowed to proceed against the named defendants. (Docs. 6, 7.) The Court determined that plaintiff had stated § 1983 claims against the deputy defendants for an unlawful search and seizure and claims related to being falsely charged and prosecuted based on fabricated evidence. (Doc. 7, p. 3.) Further, the Court exercised its supplemental jurisdiction to permit state law claims of malicious prosecution and intentional infliction of emotion distress to remain in the case. (Doc. 7, pp. 3-4.) For the reasons set forth below, summary judgment should be granted to all defendants on all claims.

## II. LEGAL DISCUSSION

Qualified immunity is a judicially created defense under which government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory rights or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Rushing v. Parker, 599 F. 3d 1263, 1265 (11th Cir. 2010). Qualified immunity protects from suit all but the

plainly incompetent or those who knowingly violate the law. Carr v. Tatangelo, 338 F. 3d 1259, 1266 (11th Cir. 2003). To receive qualified immunity, a government official must first demonstrate that he was acting within the scope of his discretionary authority when the alleged violations occurred. Rushing, 599 F. 3d at 1265. To determine if the government official was acting under the scope of his discretionary authority, courts consider whether the official "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman v. Harland, 370 F.3d 1252, 1365 (11th Cir. 2004).

Effectuating a traffic stop and an arrest is a discretionary act. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). The officers' investigation into the events that occurred at the scene of the traffic stop in question were carried out in the performance of their normal job duties as deputies with the Richmond County Sheriff's Office (Exh. "B" - Decl. of Morton, II at ¶¶ 13, 16; Exh. "C" – Decl. of Hawkins at ¶ 13; Exh. "D" – Decl. of Mealing at ¶ 12; Exh. "E" – Decl. of Gaiter at ¶ 7.) Thus, the deputies were acting within their discretionary authority while on the scene, which was within the scope of their employment as officers with the Sheriff's Office.

Once a defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to overcome qualified immunity. Rushing, 599 F. 3d at 1265. "In order to defeat the government official's qualified immunity defense, the plaintiff must prove that (1) the official "'violated [his] federal constitutional… rights, and (2) that those rights were clearly established at the time the officer acted.'" Id. at 1265-66.

To receive qualified immunity, an officer need not have actual probable cause, but only "arguable" probable cause. Brown v. City of Huntsville, 608 F. 3d 724, 734 (11th Cir. 2010). "Arguable probable cause exists where reasonable officers in the same circumstances and

possessing the same knowledge as the Defendant could have believed that probable cause could have existed to arrest." Rushing, 599 F. 3d at 1266.

**A. There was No Constitutional Deprivation.**

Plaintiff contends that her constitutional rights were violated because she was unlawfully stopped and had her vehicle searched, and that she was falsely charged and prosecuted based on fabricated evidence. (Doc. 6, pp. 1, 5.) As further shown below, Plaintiff presents no genuine issue of material fact as to the legitimacy of her traffic stop and subsequent arrest, and summary judgment is appropriate.

1. Plaintiff's Detention – The Initial Traffic Stop.

Plaintiff asserts in her amended complaint that Deputy Morton stopped her vehicle for a fabricated window tint violation. (Doc. 6, pp. 2-3.) The Fourth Amendment protects against unreasonable searches and seizures. Baxter v. Roberts, 54 F.4th 1241, 1256 (11th Cir. 2022). "An officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Reid v. Henry Cty., 568 F. App'x 745, 748 (11th Cir. 2014) "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). A traffic stop is constitutional if the officer has reasonable suspicion to believe that criminal activity has occurred, is occurring, or is about to occur. Baxter, 54 F.4th at 1256 (citing United States v. Campbell, 26 F.4th 860, 880 (11th Cir. 2022) (en banc)). "In other words, an officer making a stop must have a particularized and objective basis for suspecting the person stopped of criminal activity." Id. "Even minor traffic violations qualify as criminal activity." Id.

Deputy Morton had reasonable suspicion to believe a traffic violation had occurred. He observed and articulated a reasonable and lawful basis for the initial stop: excessively dark window tint. (Exh. "A" – Depo. of Plaintiff at pp. 12, 15, 36; Exh. "B" – Decl. of Morton at ¶ 3 and Exhs. 1 and 2.) At the time, Georgia law prohibited the operation of motor vehicles with window tinting that reduces light transmission below specified thresholds, including below 32 percent, plus or minus 3 percent, on the rear windshield or side or door windows. O.C.G.A. § 40-8-73.1 (2026). Deputy Morton observed that Plaintiff's vehicle windows appeared to have tinting that violated these statutory requirements, providing lawful justification for the stop. Furthermore, when Deputy Morton tested the tint with his window tint meter, the tint measured 17%, in violation of Georgia window tint laws. Id. (Exh. "B" – Decl. of Morton at ¶ 11 and Decl. Exh. 1.)

In her deposition, Plaintiff acknowledged that Deputy Morton stopped her for a tint violation, as evidenced by his body camera video, and that she had no evidence that excessive tint was not the reason for her traffic stop. (Exh. "A" – Depo. of Plaintiff at pp. 12, 15-18, 36.) As such, the stop was not unreasonable under the circumstances, and defendants are entitled to summary judgment in the absence of any evidence of a constitutional violation.

2. Plaintiff's detention and the open air sniff did not violate Plaintiff's constitutional rights.

Plaintiff contends that Deputy Morton prolonged detention without reasonable suspicion, and that Deputy Hawkins and Deputy Mealing unlawfully deployed a K-9 that was not certified and concealed the alleged failure to alert. Under the Fourth Amendment, an officer's mission during a traffic stop is to address the traffic violation that warranted the stop and to attend to related safety concerns. Johnson v. Nocco, 91 F.4th 1114, 1121 (11th Cir. 2024). Ordinary inquiries incident to a traffic stop include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of

insurance. Baxter, 54 F.4th at 1259. These tasks serve the objective of ensuring that vehicles on the road are operated safely and responsibly and are part of the stop's lawful mission. Id.

A traffic stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. Id. However, an officer conducting a lawful traffic stop may perform certain unrelated checks—including a dog sniff—during the stop, provided that he does not do so in a way that prolongs the stop absent reasonable suspicion ordinarily demanded to justify detaining an individual. United States v. Jones, 2026 U.S. App. LEXIS 17402, at * 5 (11th Cir. June 16, 2026). The Supreme Court has ruled that a dog sniff to determine the presence of drugs is not a "search" within the meaning of the Fourth Amendment.[1] Id. The critical question is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff prolongs—that is, adds time to—the stop. Id. at 5-6.

The Eleventh Circuit has long recognized that when a drug-trained and certified K9 alerts to a vehicle during a lawful stop, the alert provides probable cause to search the vehicle. Meshal v. Wright, 651 F.Supp.3d 1273, 1294 (S.D. Ga. 2022). Further, the Eleventh Circuit has consistently held that when a K-9 unit arrives and conducts a sniff while officers are still conducting routine records checks and preparing traffic citations, the use of the K-9 does not offend the Fourth Amendment. United States v. Braddy, 11 F.4th 1298, 1311-12 (2021); Jones, 2026 U.S. App. LEXIS 17402, at *5. In the recently decided Jones case, the Eleventh Circuit noted that the dog sniff did not unlawfully prolong the stop because the uncontroverted evidence established that the K-9 unit arrived before the officer that initiated the traffic stop had completed his investigation of the stop. Jones, 2026 U.S. App. LEXIS 17402, at *6. The K-9 alerted to the presence of narcotics in the stopped vehicle while the officer was still in his vehicle and before he

[1] In her amended complaint, plaintiff alleged an unlawful K-9 order, which fails under the Jones case.

completed his investigation and the mission of the stop. Id. In Braddy, the court held that a K-9 sniff did not unlawfully prolong a traffic stop when it occurred while the officer was waiting for a warrant check return before the issuance of a warning citation. Braddy, 11 F.4th at 1311-12.

Applying these principles to the undisputed facts, the detention and K-9 sniff did not unconstitutionally prolong Plaintiff's detention. Deputy Morton performed a traffic stop of the plaintiff for excessive window tint, a valid basis for the stop under Georgia law, establishing a lawful basis for the initial stop. The open-air dog sniff was performed within two minutes of the traffic stop, while Deputy Morton was performing ordinary inquiries incident to the traffic stop, including checking the driver's license, checking for outstanding warrants, and inspecting registration and proof of insurance. (Exh. "B" - Dec. of Morton, ¶ 4; Dep. of Plaintiff, p. 20-21, 23, 42) Plaintiff admitted that the open air sniff occurred within two minutes of the initial traffic stop while Deputy Morton was still in his vehicle with her license. (Dep. of Plaintiff, p. 20-21, 23, 42.) When the open air sniff occurred, Deputy Morton had not completed performing the records check and verification of plaintiff's information. (Exh. "B" – Decl. of Morton at ¶4.) Under Braddy and Jones, the fact the open air sniff occurred prior to Deputy Morton's completion of the ordinary inquiries incident to the traffic stop establishes that the open air sniff did not prolong the stop.

Gajes, the K-9 deployed, and his assigned handler, Deputy Hawkins, were certified on the date in question for detection odor of narcotics, including marijuana and methamphetamines, which plaintiff acknowledged in her deposition. (Ex. "C" - Dec. of Hawkins, ¶ 8, Exh. 2; Dep. of Plaintiff, pp. 47-50.) Thus, there is no merit to plaintiff's claims that Deputy Hawkins deployed a K-9 that was not certified. Furthermore, Deputy Hawkins and Gajes were extensively trained in narcotics odor detection, having received over 500 hours of training for detection of narcotics odors. (Exh. "C" - Dec. of Hawkins, ¶ 9.) Plaintiff has presented no evidence to the contrary.

During the open air sniff, Gajes displayed a trained final response on the right side of plaintiff's vehicle by becoming rigid in his stance and coming to a final alert, a sit, indicating the presence of the odor of narcotics. (Exh. "C" – Decl. of Hawkins at ¶ 5.) Once the K-9 alerted, deputies obtained the requisite probable cause necessary to conduct a search of the vehicle. Meshal, 651 F.Supp.3d at 1294. The search of the vehicle led to the discovery of a white powdery substance that field tested positive for methamphetamine, two pills identified as oxycodone, and marijuana. (Exh. "A" - Dep. of Plaintiff, pp. 13, 26-27, 51; Exh. "B" - Dec. of Morton, ¶ 7.) Plaintiff admitted that the white substance field-tested positive for methamphetamine and that she has no evidence to dispute the results of this field test. (Exh. "A" - Dep. of Plaintiff, p. 51.)

Plaintiff's contention that Deputy Hawkins concealed the K-9's alleged failure to alert by not activating his body camera is similarly insufficient. Deputy Hawkins has stated under oath that the K-9 alerted. (Exh. "C" - Dec. of Hawkins, ¶ 5.) Furthermore, Deputy Mealing stated he observed the alert and it is captured on his body camera video. (Exh. "D" - Dec. of Mealing, ¶ 5, Exh.1.) In her deposition, Plaintiff admitted that she has no training or expertise in K-9 drug detection, that she has no expertise in recognizing K-9 alerts, and that she cannot affirmatively state that the K-9 did not alert. (Exh. "A" - Dep. of Plaintiff, pp. 25-26, 33.) Absent evidence demonstrating that the K-9 did not alert, Plaintiff's speculation cannot defeat summary judgment. Furthermore, the discovery of drugs in Plaintiff's vehicle corroborates the K-9's alert and supports the conclusion that the alert was genuine.

The entire sequence from initial stop to completion of the K-9 sniff occurred within two to three minutes. There is no indication that Deputy Morton prolonged, detoured from, or delayed his ordinary inquiries incident to the traffic stop to conduct the sniff, and Plaintiff could not point to any evidence that the officers did anything to prolong the stop. (Exh. "A" - Dep. of Plaintiff,

pp. 60-61.) Furthermore, Deputy Hawkins and Gajes were certified and trained in detection of methamphetamines and marijuana, which were both found after the K-9 alert and search of the vehicle. The uncontroverted evidence shows that the K-9 sniff occurred while Deputy Morton was still engaged in tasks ordinarily incident to the traffic stop. Plaintiff's license had not been returned, and she had not been told she was free to leave as the routine records checks necessary to complete the traffic stop were still ongoing. As the open air sniff did not lengthen the detention, the open air sniff itself did not violate the Fourth Amendment, and the subsequent alert provided probable cause to continue the detention and search. Thus, the defendants are entitled to summary judgment.

**B. Qualified immunity bars all claims against defendants in their individual capacities.**

Under the facts here, the plaintiff cannot circumvent the individual defendants' qualified immunity. First, the conduct complained of was clearly within their discretionary authority. Public officials are acting within their discretionary authority if they are (a) performing a legitimate job-related function (that is, pursuing a job-related goal); (b) through means that were within their power to utilize. The individual defendants' conduct falls within this definition, as all individual defendants were acting as sworn peace officers within their discretionary authority.

Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action. Harlow, 457 U.S. at 818. An officer is entitled to qualified immunity unless he (1) violated a constitutional right, and (2) that constitutional right was clearly established at the time. Rushing, 599 F.3d at 1265-66. As demonstrated above, the individual Defendants did not violate Plaintiff's Constitutional rights. Because no constitutional violation occurred, the individual Defendants are entitled to qualified immunity.

Even if a constitutional violation had occurred—which Defendants deny—the individual Defendants would still be entitled to qualified immunity because their conduct did not violate clearly established law. At the time of the traffic stop, it was clearly established that conducting a K-9 sniff during the ordinary course of a traffic stop, without prolonging the stop, does not violate the Fourth Amendment. Braddy, 11 F.4th at 1311. The Eleventh Circuit has repeatedly held that when a K-9 unit arrives while officers are still conducting routine records checks and preparing traffic citations, the K-9 sniff does not offend the Fourth Amendment. Id. at 1311-12. A reasonable officer in the individual Defendants' position would have understood that conducting a K-9 sniff within two to three minutes of initiating a traffic stop, while the initiating officer was still running license and registration checks, was lawful under clearly established precedent.

Plaintiff has not identified any case holding otherwise. Absent such a case, the individual Defendants are entitled to qualified immunity.

**C. Defendants, including Sheriff Brantley, are entitled to summary judgment on Plaintiff's claims that she was unlawfully stopped and searched based on race.**

The Equal Protection Clause of the Fourteenth Amendment prohibits selective enforcement of the law based on considerations such as race. Whren v. United States, 517 U.S. 806, 813 (1996). It also prohibits law enforcement officers from engaging in selective enforcement based on race, but a plaintiff must show both discriminatory purpose and discriminatory effect. Andre v. Clayton County, 148 F.4th 1282, 1305 (11th Cir. 2025). Disproportionate impact alone is not enough to establish an Equal Protection violation. Id. at 1306. Proof of discriminatory intent or purpose is also required. Parks v. City of Warner Robins, 43 F.3d 609, 616 (11th Cir. 1995). Racial profiling must brought under the Equal Protection Clause, "but the evidentiary showing under that can be daunting to say the least." Mills v. United States, 2010 U.S. Dist. LEXIS 112822 at *15 n.5 (S.D. Ga. Sept. 29, 2010).

When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose. Id. "To make out a selective-enforcement claim, a [plaintiff] bears the burden to demonstrate that officials acting under the color of law had discriminatory motivations and that similarly situated individuals of a different race who committed substantially the same violation were not subject to the same enforcement." United States v. Lewis, 2023 U.S. App. LEXIS 26963 at *4 (11th Cir. Oct. 11, 2023).

Here, no evidence exists that any defendant acted because of plaintiff's race. The record contains no evidence any defendant made any race-based statements, relied upon race in deciding how to proceed with the traffic stop or subsequent encounter with the plaintiff, applied a race-based policy, practice or custom, treated similarly situated individuals of another race differently, or otherwise acted with discriminatory purpose. Andre, 148 F.4th at 1305. Nor has Plaintiff identified any similarly situated driver of another race who committed the same or comparable traffic violations, was subject to the same circumstances, and was treated more favorably. Lewis, 2023 U.S. App. LEXIS 26963 at *4. Plaintiff's claim rests only on speculation and her disagreement with the arrest, and she has failed to show the required discriminatory purpose and discriminatory effect. Andre, 148 F.4th at 1305.

Plaintiff's reliance on Deputy Mealing's statement that she "looks angry" and "let's make this quick" does not change this result.[2] These statements are facially race-neutral and contain no reference to race, racial stereotypes, racial bias or any indication that plaintiff's race played a role in the defendants' decisions. These statements cannot constitute evidence of racial animus. See

---

[2] Plaintiff asserts that Deputy Mealing also stated "Let's make this quick," but from a review of his body camera video it does not appear this was said. However, it is also a facially race-neutral statement subject to the same analysis. (Doc. 6, p. 3; Exh. "D" – Dec. of Mealing, Exh. 1.)

Crutchfield v. City of Manchester, 2009 U.S. Dist. LEXIS 134284 at *16 (N.D. Ga. Dec. 2, 2009) (statement that did not reference race was neutral and did not suggest discriminatory animus).

Deputy Mealing's comments on plaintiff's demeanor were observations based solely on her expressions, tone, demeanor and conduct, and it was not based on race or intended as a reference to plaintiff's race or any racial characteristic. (Exh. "D" – Decl. of Mealing, ¶¶ 6-9.) An officer's observation regarding a person's demeanor during a law enforcement encounter—even if Plaintiff disagrees with that characterization—does not constitute evidence of intentional racial discrimination. At most, the statement reflects an observation regarding Plaintiff's perceived emotional state; it does not support an inference that Defendants acted because of Plaintiff's race. A constitutional violation cannot be established through speculation that a race-neutral observation must have reflected discriminatory intent.

Because Plaintiff offers no evidence of discriminatory purpose, no evidence of discriminatory effect, and no similarly situated comparator, her race-based § 1983 theory fails as a matter of law. The alleged statement "let's make this quick" because Plaintiff "looked angry" is, at most, a facially neutral comment about demeanor and the pace of the K9 sniff. It does not create a genuine dispute that the stop, K9 sniff, search, arrest, citations, reporting, supervision, training, or policies were based on Plaintiff's race. Defendants are therefore entitled to summary judgment on any race-based Equal Protection claim.

Finally, Plaintiff's race allegation cannot sustain an official-capacity policy, supervision, or training theory against the Sheriff. To the extent Plaintiff contends that the Sheriff maintained unconstitutional policies or failed to train or supervise deputies with respect to race-based stops, searches, or reporting, the claim still requires proof of an underlying race-based constitutional violation. Plaintiff has no evidence that the deputies acted because of race, no comparator

evidence, no pattern of similar race-based incidents, and no evidence that any policy or training deficiency caused racially discriminatory enforcement. Without a triable race-based constitutional violation, there is no basis for official-capacity liability on that theory. See Miller v. Harget, 458 F.3d 1251, 1261 (11th Cir. 2006).

**D. Defendants are entitled to Qualified Immunity as to any alleged § 1983 violation for malicious prosecution.**

To the extent plaintiff claims a § 1983 violation for malicious prosecution against the defendants based upon this discrepancy in the reports, it is also barred by qualified immunity. Plaintiff contends that she was falsely charged and prosecuted based upon evidence that was fabricated. Plaintiff bases this upon the amount of marijuana found, as Deputy Hawkins' K-9 report lists it as 10 grams, whereas the case report and chain of custody list it as 20 grams, incorrectly arguing it thereby converted a misdemeanor into a felony. Plaintiff also has taken issue with Deputy Morton using the pill identifier on the website Drugs.com to confirm that the two pills found were oxycodone. Defendants are entitled to qualified immunity related to these allegations as well.

In order to establish a § 1983 violation for malicious prosecution, the plaintiff must show that the legal process justifying her seizure was constitutionally infirm. Harris v. Hixon, 2022 U.S. Dist. LEXIS 127851, at *20-21 (S.D. Ga. July 19, 2022), aff'd, 102 F. 4th 1120 (11th Cir. 2024); Laskar v. Hurd, 972 F. 3d 1278, 1284 (11th Cir. 2020). A § 1983 claim for malicious prosecution also requires the plaintiff to show both the elements of the common law tort of malicious prosecution in addition to an unreasonable seizure in violation of the Fourth Amendment. Smith v. Mitchell, 856 F. App'x 248, 249 (11th Cir. 2021); Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003); Harris, 102 F.4th at 1133. For purposes of a § 1983 claim, the elements of the common law tort of malicious prosecution are: (1) a criminal prosecution instituted or continued by the present

defendant, (2) with malice and without probable cause, (3) that terminated in the plaintiff accused's favor, and (4) caused damage to the plaintiff accused. Smith v. Mitchell, 856 F. App'x at 249; Wood, 323 F. 3d at 881.

As explained above, to receive qualified immunity, an officer need not have actual probable cause, but only "arguable" probable cause. Brown, 608 F. 3d at 734. "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause could have existed to arrest." Rushing, 599 F. 3d at 1266 (citations omitted).

First, the plaintiff must show that the legal process justifying her seizure was constitutionally infirm. Under O.C.G.A. § 16-13-2 (b), possession of one ounce (approximately 28.35 grams) or less of marijuana is a misdemeanor. Because both 10 grams and 20 grams are well under this threshold, both amounts constitute the exact same misdemeanor offense, and Plaintiff was never charged with felony possession of marijuana. (Dep. of Plaintiff, p. 56.). The discrepancy does not affect the existence of probable cause for the arrest or the subsequent charges, meaning sufficient information to find probable cause still existed, regardless of the specific weight. Furthermore, there is no record evidence that the "approximately 20 grams" of marijuana listed in the case report is incorrect. Courts have previously held that "while a police officer's investigation may be less than perfect, inadvertent errors, honest mistakes, agency confusion, even negligence in the performance of duties, do not warrant redress under 42 U.S.C. § 1983." Hutchinson v. Whaley, 333 Ga.App. 773, 777 (2015).

Because either reported amount supported the same misdemeanor possession charge, the inadvertent discrepancy in the K-9 Report did not cause a distinct seizure, prosecution, charge enhancement, or other constitutional injury. Moreover, even if a constitutional violation existed,

plaintiff must prove that the right was clearly established by either identifying a materially similar and binding case; a broader, clearly established principle that should control the novel facts of this case; or that the conduct so obviously violates the Constitution that prior case law is not necessary. Davis v. Waller, 44 F.4th 1305, 1312-13 (11th Cir. 2022). No binding precedent exists establishing that an immaterial discrepancy in the recorded weight of contraband—where both weights constitute the identical misdemeanor charge—violates the Fourth Amendment. Furthermore, a discrepancy in reports that does not alter the charge is not an obvious violation of the Constitution negating the need for case law on point, and the facts are not so novel that a broader, clearly established principle should control. Id.

Second, the plaintiff cannot establish that Deputy Morton or any other defendant acted with malice and without probable cause as required by the second element of the state law malicious prosecution claim, required to establish a § 1983 malicious prosecution claim. Harris, 2022 U.S. Dist. LEXIS 127851, at *20. There is no evidence that Deputy Morton or any of the other officers had any personal animus, ill will, or spite toward the plaintiff. (Exh "B" – Decl. of Morton at ¶ 19; Exh. "C" – Decl. of Hawkins at ¶ 15; Exh. "D" – Decl. of Mealing at ¶ 14; Exh. "E" – Decl. of Gaiter at ¶ 9.) Further, plaintiff could not provide any facts, evidence or information to suggest that the deputies acted towards her with malice. (Exh. "A" – Dep. of Plaintiff, p. 28.)

Moreover, Deputy Morton had at least arguable probable cause to believe that the plaintiff had committed the offense of possession of marijuana, because the plaintiff was arrested and charged with other independent felonies, and because possession of either 10 or 20 grams of marijuana constitutes a crime under O.C.G.A. § 16-13-2 (b). As recognized by the Eleventh Circuit, "[p]robable cause renders a seizure pursuant to legal process reasonable under the Fourth Amendment." Harris, 102 F. 4th at 1126. Probable cause is not a high bar, and it exists if the

totality of the circumstances could persuade a reasonable officer that there is a "substantial chance of criminal activity by the person who was arrested." Id. Even if the charges against the plaintiff were ultimately dismissed, that does not negate the existence of probable cause at the time of her arrest. Id. Deputy Morton and the other officers' conduct here is the type that qualified immunity is meant to protect.

Likewise, Deputy Morton is entitled to qualified immunity as to the use of Drugs.com to confirm the identity of the oxycodone. He has provided evidence that, based upon training and experience, he and the other deputies identified the pills as oxycodone, and that Drugs.com, an accepted and reliable resource used to confirm pill identity, was solely used to confirm his identification. (Exh. "B" - Dec. of Morton, ¶¶ 9-10.) Deputy Morton had arguable probable cause based upon the deputies' identification of the pills as oxycodone. Brown, 608 F. 3d at 734. Notably, there is no evidence in the record that the pills were misidentified. Consequently, an officer's use of a pill identifier to visually match the appearance, markings, and characteristics of a pill constitutes a "reasonably trustworthy" method to establish a probability that the substance is oxycodone, satisfying the threshold for arguable probable cause. Id. at 734.

For these reasons, defendants are entitled to qualified immunity as to any alleged § 1983 claims for malicious prosecution and summary judgment is appropriate.

**E. Deputy Gaiter is separately entitled to Summary Judgment.**

Each defendant in a § 1983 case is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions. This is because § 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation. Alcocer v. Mills, 906 F. 3d 944, 951 (11th Cir. 2018).

In the present case, Deputy Gaiter's role was to assist as needed in the traffic stop. (Exh "E" - Dec. of Gaiter, ¶ 3.) He was not the arresting officer, he did not prepare a report, and he had no further involvement after plaintiff was transported from the scene. (Id. at ¶ 4. ) The only mention of him in plaintiff's amended complaint is the allegation that he approved falsified chain of custody. (Doc. 6, p. 4.) However, the chain of custody does not include Deputy Gaiter's name anywhere on it, and he had no involvement in the review, preparation, approval or otherwise of the chain of custody. (Doc. 6-1; Exh. "E" – Decl. of Gaiter, ¶ 5.)

There is no affirmative causal of connection between any actions or omissions of Deputy Gaiter and the plaintiff's alleged constitutional deprivation. While Deputy Gaiter is entitled to summary judgment for all of the reasons enumerated above, he is also entitled to summary judgment for this separate additional reason.

**F. Sheriff Brantley is entitled to summary judgment in his official capacity on plaintiff's claim for a violation of her rights due to alleged policies, customs or procedures.**

Plaintiff alleges that Sheriff Brantley, in his official capacity, is responsible for the alleged constitutional deficiencies in the search and seizure of plaintiff because of his maintaining unconstitutional policies post-arrest and his failure to properly police allegedly falsified, post-arrest reporting with appropriate policies, supervision, or training. (Doc. 6 at p. 4.) A governmental entity cannot be held liable under § 1983 for a deprivation of constitutional rights committed by an employee merely based upon respondeat superior or agency. See Monell v. Dept. of Social Services, 436 U.S. 658, 691 (1978). In order to prove a Monell claim, plaintiff must first prove her constitutional rights were violated. Id. For a governmental entity to be liable for constitutional deprivations allegedly committed by an employee, the plaintiff must prove that the entity had a custom, policy or practice which caused the alleged constitutional deprivation to occur. See City of Canton v. Harris, 489 U.S. 378, 385 (1989). To show custom or practice in the Eleventh Circuit,

it is generally necessary to show a "persistent or widespread practice" resulting in constitutional deprivation; that is, random acts or isolated instances are insufficient to establish custom or practice. Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994).

Here, plaintiff not only fails to present evidence challenging the legitimacy of the traffic violation in plaintiff's case or of any other constitutional violation, but neither plaintiff nor the evidence in the case demonstrates an official government policy or custom inflicting the alleged constitutional violation. When asked in her deposition to identify any policies, customs or procedures of the Sheriff that violated her constitutional rights, plaintiff could only point to specific allegations in her case regarding the use of a website to identify the oxycodone pills, the discrepancy in the amount of marijuana stated in the case report and the K-9 report, and the alleged falsification of the K-9 alert. (Exh. "A" - Dep. of Plaintiff, pp. 53-54, 58, 63.) Plaintiff had no knowledge of any other claims related to misidentification of drugs. (Id. at 58.) When asked if she was aware of any previous claims alleging the falsification of K-9 alerts, Plaintiff stated she had seen an article in which someone else alleged that Deputy Hawkins fabricated a dog alert, but she could not identify the person making the allegation, the year, date, or website. (Id. at 58.) Further, Plaintiff was unable to provide the referenced article in response to Defendant's discovery requests. (Exh. "F" – Defendant's Requests for Production of Documents; Exh. "G" - Plaintiff's Response to Defendant's Requests.) Other than this unproduced article, Plaintiff was unaware of any other lawsuits or complaints asserting falsification of K-9 alerts or misidentification of drugs. (Exh. "A" - Dep. of Plaintiff at 59-60, 62.) Plaintiff also has no evidence that the Sheriff was aware of any alleged falsification of K-9 alerts, misidentification of drugs or falsified reports. (Id. at 60.) Deputy Hawkins is unaware of any other complaints or allegations lodged against him for falsifying a K-9 report or K-9 alert. (Exh. "B" – Decl. of Hawkins, ¶ 12.) Further, plaintiff failed

to produce any evidence of other policies or procedures that allegedly violated her constitutional rights.

As set out above, for a governmental entity to be liable for constitutional deprivations allegedly committed by an employee, the plaintiff must prove that the entity had a custom, policy or practice which caused the alleged constitutional deprivation to occur by showing a "persistent or widespread practice" resulting in constitutional deprivation. The plaintiff has no evidence in this regard.

Even assuming *arguendo* that these allegations occurred, plaintiff has only shown random acts or isolated instances that occurred in this case, insufficient to establish a custom or practice. No evidence of any other similar occurrences are identified, let alone a "persistent or widespread practice" resulting in constitutional deprivation. Plaintiff not only fails to present evidence challenging the legitimacy of the traffic violation in plaintiff's case, but the record is devoid of evidence suggesting that any alleged custom, policy or practice has caused a constitutional deprivation to the Plaintiff. Accordingly, Sheriff Brantley, in his official capacity, is entitled to summary judgment.

**G. The Plaintiff's State Law Claims Should All Be Dismissed as a Matter of Law.**

The plaintiff has brought claims under Georgia law alleging malicious prosecution and intentional infliction of emotional distress. She also seeks punitive damages under Georgia law. The Court should rule on each of these claims as they share many of the same elements as the plaintiff's federal law claims and they all are subject to dismissal as a matter of law.

1. <u>Defendants Are Entitled to Summary Judgment With Respect to the Plaintiff's Malicious Prosecution Claims</u>.

To succeed on a claim for malicious prosecution under Georgia law, the plaintiff must prove: (1) prosecution for a criminal offense; (2) instigated without probable cause; (3) with malice; (4) under a valid warrant, accusation or summons; (5) which has terminated favorably to the plaintiff; and (6) has caused damage to the plaintiff. Harris, 2022 U.S. Dist. LEXIS 127851, at *29-30. These defendants are protected by the doctrine of official immunity under Georgia law. Under the Georgia Constitution, public officers and employees are offered limited protection from suit in a personal capacity. Wilson v. Cromer, 356 Ga. App. 763, 765 (2020). The Georgia Constitution provides:

> [A]ll officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or the actual intent to cause injury in the performance of their official functions.

Ga. Const. Art. I, Sec. II, Para. IX (d).

Law enforcement officers, thus, are immune from liability unless they negligently perform ministerial tasks or act with actual malice in performing discretionary tasks. Anderson v. Cobb, 258 Ga. App. 159, 160 (2002). A law enforcement officer's investigation of a case, like the actions of making a warrantless arrest, is a discretionary act within the scope of the officer's official functions. See, e.g., Wilson v. Cromer, 356 Ga. App. at 765; Anderson 258 Ga.App. at 160. Accordingly, a law enforcement officer acting in such a capacity is insulated from suit unless there is evidence that he acted with actual malice, defined in the context of official immunity as follows:

> In the context of official immunity, actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact. Actual malice does not include implied malice or the reckless disregard of the rights and safety of others. A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiff.

Wilson, 356 Ga. App. at 765 (citations omitted). The purpose of the doctrine of official immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight. Selvy v. Morrison, 292 Ga. App. 702, 703 (2008).

Here, probable cause existed for the initial traffic stop for a window tint violation and the subsequent search of plaintiff's vehicle based upon the K-9 sniff and resulting alert. The record is devoid of any evidence to suggest that Deputy Morton or the other officers acted with actual malice. There is no evidence that these officers had any personal animus, ill will, or spite toward the plaintiff. (Exh. "B"– Decl. of Morton at ¶ 19; Exh. "C" – Decl. of Hawkins at ¶ 15; Exh. "D" – Decl. of Mealing at ¶ 14; Exh. "E" – Decl. of Gaiter at ¶ 9.) Further, plaintiff in her deposition stated that she had no reason to believe any of the deputies had a personal grudge against her and that she has no evidence, facts or information to suggest the deputies acted towards her with malice. (Exh. "A" – Dep. of Plaintiff, p. 28.) There is no evidence of deliberate intent to do wrong, and numerous cases have recognized that official immunity applies to a claim of malicious prosecution in these circumstances. See, e.g., Stephens v. Zimmerman, 333 Ga. App. 586, 591 (2015); Todd v. Kelly, 244 Ga. App. 404, 406-407 (2000); Marshall v. Browning, 310 Ga. App. 64, 67-68 (2011). Accordingly, these defendants are entitled to summary judgment on the plaintiff's state law malicious prosecution claim.

2. Defendants Are Entitled to Summary Judgment With Respect to the Plaintiff's Intentional Infliction of Emotional Distress Claim.

Under Georgia law, a claim for intentional infliction of emotional distress (IIED) requires proof that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress was severe. Yarbray v. S. Bell Tel. & Tel. Co., 261 Ga. 703, 706 (1991). Whether conduct is sufficiently extreme and outrageous is a question of

law for the Court. Id. Under Georgia law, a plaintiff seeking to recover for IIED arising from a traffic stop and arrest must establish that the officer's actions were unlawful. Draper v. Reynolds, 278 Ga.App. 401, 403 (2006). "Georgia courts have held that, where an [IIED] claim is based on an unlawful search or arrest, probable cause will usually negate any possibility that the conduct was so outrageous-thus precluding the claim." Captain Jack's Crab Shack, Inc. v. Cooke, 2022 U.S. App. LEXIS 26523, at *38 (11th Cir. Sept. 22, 2022). To meet the extreme and outrageous test, the conduct "must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Udoinyion v. Re/Max, 289 Ga.App. 580, 584 (2008). "The conduct must inflict emotional distress so severe that no reasonable person could be expected to endure it." Id.

Here, as shown above, defendants had probable cause in connection the search and arrest of plaintiff, thereby negating that the conduct was outrageous and precluding this claim. Further, Plaintiff admitted she does not know any of the deputies involved and that she has no evidence to believe any of them had a desire to see her arrested or had a personal grudge against her, or that they acted towards her with malice or intent to see her arrested. (Exh. "A" – Dep. of Plaintiff, pp. 27-28.) There is no evidence that these officers had any personal animus, ill will, or spite toward the plaintiff. (Exh. "B"– Decl. of Morton at ¶ 19; Exh. "C" – Decl. of Hawkins at ¶ 15; Exh. "D" – Decl. of Mealing at ¶ 14; Exh. "E" – Decl. of Gaiter at ¶ 9.) Plaintiff's claim fails as the undisputed facts do not show extreme and outrageous conduct, do not show that any deputy intended to cause emotional distress or acted recklessly, and because the defendants had probable cause to conduct the search and arrest. At most, Plaintiff alleges distress arising from the ordinary consequences of an arrest following a traffic stop, K9 alert, vehicle search, and discovery of suspected controlled substances. That is insufficient as a matter of Georgia law.

The defendants have official immunity. Under the Georgia Constitution, public officers and employees are immune from personal liability for discretionary acts performed within the scope of their official authority unless they act with actual malice or actual intent to cause injury. Ga. Const. art. I, § II, para. IX(d). As shown above, defendants did not act with actual malice, and under Georgia law an officer's investigative decisions are discretionary. Hutchinson, 333 Ga.App. at 776. "Actual malice" in this context requires a deliberate intention to do wrong, not merely negligence, ill will, or a mistaken judgment. Adams v. Hazelwood, 271 Ga. 414, 414-15 (1999). "Actual intent to cause injury" means an actual intent to cause the harm suffered, not merely an intent to do the act that allegedly resulted in injury. Kidd v. Coates, 271 Ga. 33, 33 (1999).

Plaintiff's own testimony defeats any attempt to pierce official immunity. She admitted she has no evidence that the deputies acted with malice, held a grudge, desired to see her arrested, threatened her, or even knew her. (Exh. "A" – Dep. of Plaintiff, pp. 27-28.) Plaintiff's disagreement with the arrest, and her distress that it occurred in front of her children, do not create evidence of actual malice or actual intent to injure. Accordingly, Defendants are entitled to official immunity and are therefore entitled to summary judgment on Plaintiff's Georgia intentional infliction of emotional distress claim.

3. The Plaintiff's Punitive Damages Claim Under Georgia Law Is Without Merit.

A punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required. Mann v. Taser Int'l, Inc., 588 F. 3d 1291, 1304 (11th Cir. 2009). The plaintiff's substantive claims under Georgia law should be dismissed as a matter of law, and her derivative claim for punitive damages is subject to dismissal as well.

To the extent plaintiff seeks recovery against these officers or Sheriff Brantley for punitive damages under 42 U.S.C. § 1983, recovery of punitive damages requires a demonstration that a defendant's conduct "is shown to be motived by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983); Anderson v. Atlanta, 778 F. 2d 678, 688 (11th Cir. 1985). There is no evidence that these defendants had any evil motive or intent, as shown in section 3, *supra*. Further, there is no demonstration that they were reckless or callously indifferent to the federally protected rights of the plaintiff. The plaintiff fails to establish that these officers committed any constitutional violation. Where there is no constitutional violation and no establishment of the requirements for punitive damages under a § 1983 claim, summary judgment should be granted. See Cherry v. Allen, 765 F. Supp. 3d 1321, 1354 (S.D. Ga. 2025).

## II. CONCLUSION

For the foregoing reasons, Defendants Deputy Michael Morton, Deputy Joseph Hawkins, Corporal Bryan Mealing, Corporal Leslie Gaiter, and Sheriff Eugene Brantley are entitled to summary judgment in this matter.

This 15th day of July, 2026.

*/s/ Davis A. Dunaway*
Davis A. Dunaway
Georgia Bar Number: 232092
Hull Barrett, PC
Post Office Box 1564
Augusta, Georgia 30903-1564
(706) 722-4481 (telephone)
ddunaway@hullbarrett.com
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

This is to certify that I have on this day electronically filed the foregoing **Memorandum of Law in Support of Defendants' Motion for Summary Judgment** with the Clerk of Court using the NextGen CM/ECF system and served upon the plaintiff, pro se, by email and by depositing a copy of same in the United States Mail with proper postage affixed thereto to ensure proper delivery to the following:

Ms. Tameka L. Walker
407 Woodhazel Way
Hephzibah, Georgia 30815
Walkertameka70@gmail.com

This 15th day of July, 2026.

*/s/ Davis A. Dunaway*
Davis A. Dunaway