# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| TAMEKA WALKER,<br><br>Plaintiff,<br><br>vs.<br><br>DEPUTY MICHAEL MORTON;<br>DEPUTY JOSEPH HAWKINS;<br>CORPORAL BRYAN MEALING;<br>CORPORAL LESLIE GAITER;<br>and SHERIFF EUGENE BRANTLEY,<br><br>Defendants. | CASE NO.: 1:25-cv-00100 |

\- - - - -

*DEPOSITION OF TAMEKA LUCILLE WALKER*

Taken by Counsel for the Defendants

Before Gina L. Smith, Certified Court Reporter

At the Law Offices of Hull Barrett, PC

801 Broad Street, 7th Floor, Augusta, Georgia

On Wednesday, the 11th day of March 2026

Commencing at 1:37 p.m.

\- - - - -

*PAMELA N. POPE, CCR, CVR-M*
*Certified Court Reporter*
*86 Woodlawn Lane*
*North Augusta, SC 29841*
*(706) 373-2402*
*pnpope@att.net*

## APPEARANCES OF COUNSEL

For the Plaintiff:

Tameka Walker, Pro se
1016 Laney Walker Blvd, Unit 314
Augusta, Georgia 30901
walkertameka70@gmail.com

For the Defendants:

Davis A. Dunaway, Esq.
Hull Barrett, P.C.
801 Broad Street
7th Floor
Augusta, Georgia 30901
(706)722-4481
ddunaway@hullbarrett.com

\- - - - -

## INDEX TO DEPOSITION

| | Page |
|---|---|
| EXAMINATION BY MR. DUNAWAY | 5 |
| CERTIFICATE OF COURT REPORTER | 66 |

\- - - - -

## EXHIBIT INDEX

| Defendants' | | Page |
|---|---|---|
| 1 | Notice of Deposition [2 Pages] | 6 |
| 2 | Body cam video | 46 |
| 3 | Working Dog Certification and Narcotics Detection Certification - Gajas [2 Pages] | 47 |

\- - - - -

**DEPOSITION OF**

**TAMEKA LUCILLE WALKER**

MR. DUNAWAY: This is the deposition of Tameka Walker, the plaintiff in the above matter, taken pursuant to the Federal Rules of Civil Procedure. All objections except as to the form of the question and the responsiveness of the answer are reserved until the time of trial or until the use of this deposition. If you would, please swear to witness.

[The Witness is duly sworn by the court reporter.]

MR. DUNAWAY: Ms. Walker, we met earlier. I'm Dave Dunaway. I represent the defendants in the lawsuit that you have brought against them. Have you ever given a deposition before?

THE WITNESS: No, I have not. I have not.

MR. DUNAWAY: So the way this is going to work, I'm going to ask you questions and you will respond to these questions. As you see, we've got a court reporter. She's taking down everything that we say.

THE WITNESS: Uh-huh.

MR. DUNAWAY: And that's so that she can put it into a written transcript for us after we're

done. You'll have the opportunity if you'd like to review the transcript once it's completed or you can waive it. That's called reading and signing. You can make that decision at the end. That's your decision.

THE WITNESS: Okay.

MR. DUNAWAY: The only thing I'll ask is if I ask a question that's a yes or no, if you would respond with yes or no. As we're sitting here today, if you nod your head or say uh-huh, I can tell what your response means, but then when the court reporter types it up, we can't tell if it was a yes or no.

THE WITNESS: Okay. It makes sense.

MR. DUNAWAY: And so, if at any point I correct you for that, it's not me trying to be rude. It's just trying to make sure that the record is accurate.

THE WITNESS: Okay.

MR. DUNAWAY: So that's agreeable with you?

THE WITNESS: Yes.

- - - - -

//

//

//

**TAMEKA LUCILLE WALKER,**

Having Been First Duly Sworn, was Examined

and Testifies as Follows:

**EXAMINATION**

**BY MR. DUNAWAY:**

Q. If you will, please state your full name.

A. Tameka Lucille Walker.

Q. And, Ms. Walker, have you ever been known by any other names?

A. Tameka Lucille Troy.

Q. And was that a married name?

A. That was a married name, but it was never changed with Social Security. It was just in the military.

Q. And how long -- let me ask you this, was your name originally Tameka Walker?

A. Yes, sir.

Q. Okay. And you've changed it back to Tameka Walker.

A. I've never changed it at all --

Q. Okay.

A. -- officially.

Q. So what would have been the time period where you were known by the other name?

A. From 2005 up until 2011.

Q. Ms. Walker, is there any reason today why you cannot give truthful testimony?
A. No, sir.
Q. Are you taking any medications or other substances that would impair your ability to either understand my questions or to answer them?
A. No, sir.
Q. I would like to show you --
MR. DUNAWAY: If you can mark this as exhibit one.
[Defendant's Exhibit Number 1 is marked for identification.]
Q. [Mr. Dunaway] Ms. Walker, this is just a copy of the notice of deposition that I provided to you for this deposition that we're here on today. Is this a copy of the deposition notice that you received in this case?
A. Yes, sir.
Q. Okay. Ms. Walker, what is your current address?
A. My current address is 1016 Laney Walker Boulevard, Apartment 314, Augusta, Georgia, 30901.
Q. And how long have you been at this address?
A. Since July of 2025.
Q. Okay. Do you recall what your address was

prior to July 2025?
A. Yes, sir.
Q. What was that address?
A. 2523 Teakwood Drive, Hephzibah, Georgia, 30815.
Q. And about how long did you live at that address in Hephzibah?
A. Roughly seven years.
Q. Prior to that address, did you also live in the Augusta area?
A. Yes, sir.
Q. Have you lived in the Augusta area most of your life?
A. Yes, sir. I moved away in 2005 to California, and I moved back in 2011.
Q. And I notice that coincides with the time for your name as well.
A. Yes, sir. Yes, sir.
Q. But prior to 2005, did you live in the Augusta area?
A. Yes, sir.
Q. Okay. And if you don't mind my asking, what's your date of birth?
A. June 16, 1986.
Q. If you would, tell me briefly about your

educational background. What's the highest level of education that you received?

A. I have -- I'm currently enrolled in the University of Phoenix. I'm currently a student. Yes, sir. I'm receiving my bachelor's degree in criminal justice. I also have a certification in medical office administration with the Institute of Technology. I went to Cross Creek High School, Langford Middle School. Yes, sir. I have --

Q. Did you graduate from Cross Creek?

A. No, sir, I did not.

Q. Did you obtain your GED?

A. Yes, sir. With the technical school where I received my medical office administration certification.

Q. What was the last grade level you attended at Cross Creek?

A. Ninth.

Q. I want you to briefly tell me about your work history. Are you currently employed?

A. No, I am not currently employed.

Q. Outside of the home, have you had employment in the last 10 years?

A. No, sir.

Q. Have you ever previously had a job?

A. Yes, sir. I've had jobs in the past.
Q. What was the most recent?
A. The most recent job I had, I do believe, was in 2014 at Teleperformance.
Q. And that was here in the Augusta area?
A. Yes, sir.
Q. Ms. Walker, other than this lawsuit that we're here about today, have you ever brought another lawsuit?
A. No, sir.
Q. Have you ever been sued before by someone else?
A. No, sir.
Q. Have you ever filed bankruptcy?
A. No, sir.
Q. Other than what we're here about today, have you ever been charged with a crime before?
A. No, sir.
Q. Other than what we're here about today, have you ever received any other traffic violations or citations?
A. Yes, sir.
Q. Okay. If you could, as best you can recall, tell me about those.
A. Right before I was arrested I received a

traffic violation. I do believe it was March, maybe April, I'm not sure. But of that same year.

Q. And my understanding, that was 2023.

A. Yes, sir, that's correct. I do believe I also received another citation that June. I think it was after my birthday. I think it was June 18th, 2023. But prior to that, I hadn't gotten a traffic violation probably in a decade.

Q. Do you recall what that traffic citation, the first one in March of 2023 was for?

A. Yes, it was speeding.

Q. And do you recall what the one in June of 2023 was?

A. It was no registration.

Q. Were those fairly straightforward occurrences where you received a citation and then either appeared in court or paid the citation?

A. Yes, sir.

Q. Okay. Were there any issues that you had relating to either one of those?

A. No, sir, there wasn't any issues.

Q. Ms. Walker, as I mentioned, it's my understanding from the case report that -- what we're here on today, this was a matter that happened on September 13th, 2023; is that correct?

A. Yes, sir.
Q. And my understanding as a result of that incident that day that you were arrested?
A. Yes, sir.
Q. And from the case report, it appears that this started with a traffic stop on Windsor Springs Road near Tobacco Road?
A. Yes, sir. That's correct.
Q. If you will, the stop itself, just kind of tell me in your own words what you recall about what happened with the stop.
A. Okay. I was leaving the neighborhood convenience store, the Holiday Market. I was with my brother, my younger brother, and two of my minor children. The vehicle was -- it was my brother's car. I had my own car at the house, but we were going to pick my son up from blood transfusions at MCG. When I left out of the store, I reversed out of the spot. I noticed three -- we called them silver bullets, you know, traveling in the direction I was turning out. Once they passed, I turned out. When I pulled out, I got into the far left lane to U-turn to go back up Windsor Springs so I could go down town to the hospital. When I got into the turning lane, that's when I looked in my mirror and I saw that Deputy Morton

was blue-lighting me. So I pulled over in a safe area, which was in the parking lot of -- I do believe it's a package shop. And Deputy Morton approached the vehicle, asked for my license and registration, and told me that it was a tint violation, that he was stopping me for window tint. I gave him all of my credentials, which were in good standing. By the time I gave him my credentials, within seconds, I looked and there was another officer with the K-9. Okay. The officer asked me a couple of questions, like where was I from, was I from Carolina. And then he said, we're going to walk the dog around the car because we've got to keep him trained up. At that time, I'm still in pure, like, confusion on what's going on because you just said window tint. But within a matter of moments within that, the K-9 walked around starting with the driver and walked behind the car to the passenger side. And then Corporal Mealing asked me, did we smoke some weed or something in there today, that day, or something to that nature. And he said, well, I need y'all to step out of the car right quick because we're going to search the vehicle. At that time I was just thinking about my kids in the back seat because they're in pure shock. But I just wanted to comply, you know. It's best, you know, to keep, you know, things down in

front of my daughters. They proceeded to search the vehicle. As we were standing in the back of the car, two of the officers walked up and grabbed my brother and I and put us in cuffs. And we, you know, were steady asking what we -- you know, what was going on. And then he asked me was that my purse in the car and that he had found some things inside of the purse. At that time I was then put in the back seat. My kids are crying, going crazy. I see my brothers being detained as well. He's asking why he's being detained. And so the deputy -- I'm sorry. I think it may have been Corporal Mealing, asked me was -- you know, were the contents in the purse, did they belong to me. And I let him know, like, hey, I was running out of the house. I just grabbed the purse. It's in there. It's my purse. You know, my kids are here. Let's just get this over with. They proceeded to search. They were still searching, the other officers. And I do believe that they found some marijuana under the driver's seat of the vehicle. I was Mirandized and then I was transported to the jail. We sat in the car for a second while he was writing up, I assume my traffic violations. And then I was booked into the Charles B. Webster Detention Center where I stayed until September the 15th when my family could post bond.

Q. Okay. And that was two days after the incident.

A. Yes, sir. I don't know if I need to keep going.

Q. And I'll circle back and I appreciate you walking me through it. So, I guess, just a few followups to make sure. So I believe you stated that Deputy Morton activated his blue lights --

A. Uh-huh.

Q. -- and pulled you over.

A. Yes, sir.

Q. And then you, when you had a safe area, you could pull over --

A. Uh-huh.

Q. -- you did pull over.

A. Yes, sir.

Q. Okay. And you had your brother and your two minor children in the car with you.

A. Yes, sir.

Q. What was your brother's name again?

A. Devonta Staley. That's D-E-V-O-N-T-A S-T-A-L-E-Y.

Q. All right. And so then Deputy Morton approached and asked you for your license.

A. Yes, sir.

Q. I think you said he told you that he pulled you over for a tint violation.

A. Yes, sir. Yes, sir.

Q. Did you give him your license?

A. Yes, sir.

Q. Okay. And then he went back to his vehicle with your license.

A. Yes, sir.

Q. Okay. And I believe you stated that the other deputies were on the scene quickly.

A. It was quickly because I had just saw them traveling together prior to me pulling completely out of the parking lot of the convenience store in our neighborhood. That's why they were able to respond so quickly, you know, I mean.

Q. Well, let me ask you a few questions about the vehicle itself. I believe you said that was your brother's car.

A. Yes, sir.

Q. Okay. And from the case report, I see there was a white Mercury Grand Marquis.

A. Yes, sir.

Q. Did it have tinted windows?

A. Yes, sir.

Q. Were the passenger side and the driver's side

windows tinted on both sides?
A. I can't -- I can't for certain answer that because I don't know if it was factory tint or I don't know if he had a -- you know, if he bought it like that. I don't know that for certain.
Q. Okay. Do you know what the tint level was on the windows?
A. No.
Q. Okay. So you didn't measure the tint percentage that day?
A. Absolutely not.
Q. Have you measured it since --
A. Absolutely not.
Q. Have you had anybody check the tint level on the windows?
A. Absolutely not.
Q. So you don't know what the light transmission percentage of the tint on the front driver's side window was on the day of this incident?
A. On the day of this incident, no, I do not. Not until he pulled the tint reader out at the end of the traffic stop.
Q. Okay. And do you know what that showed the tint was?
A. No, but I do have it, I do believe.

Q. And you don't have to look up anything.
A. Okay.
Q. This is just from your memory.
A. Okay.
Q. I know that the body cam footage for Deputy Morton reflected a 17 level.
A. Okay.
Q. Do you have any reason to disagree with that?
A. I don't. Because it wasn't my vehicle.
Q. But you were driving?
A. Yes, sir. I was driving.
Q. Are you aware of or do you have any documentation that would show that the tint complied with Georgia law?
A. Not right here in this moment, no, sir.
Q. Are you aware of anything that would show that the tint was legal under Georgia law?
A. Only thing I can do is ask my brother for whatever paperwork or maybe Carfax. Whatever he may have had on that vehicle that he owned at that time.
Q. And that would potentially show what the tint level was on the car?
A. Yes, sir.
Q. Okay. Do you have any reason to dispute or disagree with whatever the reading was that Deputy

Morton found on the tint?

A. I can't agree or disagree. I'm not sure.

Q. But as we're sitting here today, you cannot testify one way or the other if the tint in the vehicle you were driving complied with Georgia law.

A. I can't. I can't. I'm going to be honest.

Q. Would you agree with me that an officer looking at the vehicle from the outside could see that the windows were tinted?

A. Not from the rear. I had pulled out already and he got in behind me. So is it illegal for the back windows to be tinted?

Q. Well, and Ms. Walker, I need to ask the questions.

A. I'm sorry. I'm sorry.

Q. But what I'm asking is, generally, would an officer be able to see that there was tint on the windows that were tinted?

A. I can't answer that.

Q. But you wouldn't disagree if the officer was to say that he observed that the windows were tinted?

A. I wouldn't. I would not, no, sir.

Q. All right. So, Ms. Walker, and now I want to talk with you about the other deputies that responded. And I believe what you testified earlier was that

within seconds other deputies arrived; is that correct?
A. That is correct.
Q. And you had observed them all traveling together immediately preceding the traffic stop?
A. Well, I can't -- I don't want to say I observed them all. I observed three at that moment traveling together and then Deputy Morton, so that would have been four. Yes, sir.
Q. So, you saw -- and, again, I'm not trying to pin you down to exact numbers.
A. No, I understand. I do.
Q. But you saw three or four vehicles and deputies, I'll say, together. Deputies' vehicles together immediately before the traffic stop.
A. Yes, sir.
Q. So it's safe to say that the officers that responded to the traffic stop were close by?
A. Yes, sir.
Q. Okay. Was the K-9 unit one of those deputies' vehicles that responded within a matter of seconds?
A. Yes, sir. Within one to two minutes is, you know, exaggerated seconds. Yes, sir.
Q. Are you aware of anyone that delayed the traffic stop to allow that K-9 vehicle to get there?
A. They almost came together. It was that close

in proximity. They were -- it was less than two minutes, like less than. It was -- one officer was here walking away, there was another one.

Q. Okay.

A. It was multiple.

Q. Was one of those that you saw as Deputy Hawkins, I understand.

A. I can't -- I can't say if he was one that I saw prior to pulling out of the parking lot, because they have tint. So I can't say it was him I saw, but I did see Richmond County Sheriff's officers, traffic divisions, prior to me completely pulling out of that parking lot.

Q. And I apologize. I'm referring to the time when the stop has already begun. I'm sorry.

A. Okay.

Q. So when Deputy Morton had pulled you over --

A. Uh-huh.

Q. -- as I understand it, within seconds other deputies arrived on the scene.

A. Yes, sir.

Q. Was one of those the K-9 unit?

A. Hawkins. Yes, sir.

Q. At that point, from my review of the body cam footage, it appears that Deputy Morton was in his

patrol car with your license running it.

A. Absolutely.

Q. That's correct?

A. Yes, sir.

Q. Okay. So he had not brought you back your license at that point?

A. No. No, I didn't get it back at all.

Q. Okay. And was Deputy Morton still in his car with your license when the K-9 sniff occurred?

A. Best of my recollection, yes, sir.

Q. And at any point before the K-9 sniff had Deputy Morton told you you were free to go?

A. No.

Q. And he had not given you a citation yet related to the tint?

A. No, because it wasn't written till we got to the jail.

Q. So the tint citation was not written until after the air sniff had occurred by the dog --

A. Yes, sir.

Q. -- and the drugs were found --

A. And the transport to the Charles B., yes, sir.

Q. So is it safe to say that Deputy Morton was not done processing the traffic stop at the time that the open air sniff occurred since he still had your

driver's license and was in his car?
A. Could you ask me -- re-ask it one more time?
Q. And that's another thing I forgot to tell you. At any point you need me to rephrase or ask the question again, please.
A. Yes, sir. Could you rephrase that. Yes, sir.
Q. I will gladly do so. So at the time that the air sniff occurred --
A. Uh-huh.
Q. -- Deputy Morton was still sitting in his car?
A. Yes, sir.
Q. And he still had your driver's license?
A. Yes, sir.
Q. So is it safe to say that he had not finished processing the traffic stop as he was still with your license doing the review in his car when the open air sniff occurred?
A. I can't answer that.
Q. Okay.
A. I can't answer that.
Q. But you'd agree he hadn't given you back your license at that point?
A. Or a ticket. No, sir.
Q. Or a ticket. And at that point, we were within a minute or two --

A. Yes, sir.

Q. -- of traffic -- and I apologize, Ms. Walker. If you'll let me finish the question, just so it makes it easier for the court reporter.

A. I'm sorry.

Q. But I'm bad about it.

A. I'm sorry.

Q. If we're talking over each other, it's more difficult for the court reporter.

So, what I was asking you is, at the time that Deputy Morton had your license in his car and the open air sniff occurred by the dog, so that was still within a minute or two of the traffic stop?

A. Yes, sir.

Q. Okay. Thank you. So as far as the – and I'm calling it an open-air sniff or a dog sniff, but I'm referring to when the dog came around the vehicle. At any point prior to that, did any of the deputies ask for consent to search your vehicle?

A. No, sir.

Q. Okay. So when the dog sniff began, tell me what you recall specifically about that.

A. What I specifically recall is him telling me that the dog was there because they -- the dog was there because they had -- they got to keep the dogs

trained up.
Q. Okay.
A. That was the reason.
Q. When the dog sniff occurred, were you still in the vehicle?
A. Yes, sir.
Q. Had anyone gotten out of the vehicle?
A. No, sir.
Q. Had any of the deputies opened any of the doors to the vehicle?
A. I'm not sure. I can't answer that one.
Q. Did the dog enter the vehicle?
A. No.
Q. And so the dog just walked around the outside of the vehicle?
A. Yes, sir.
Q. Okay. Do you recall where the dog was when it alerted?
A. Allegedly on the passenger side of the vehicle.
Q. Okay. So on the passenger side, the opposite side from you in the driver's seat?
A. Yes, sir.
Q. Okay. Do you remember what area of the vehicle? Was it the back, the middle, the front?

A. Allegedly, the -- I would say the middle was like between the doors, like between the passenger door and the back passenger. It was in -- he was standing in that area.

Q. Okay. Were you watching the dog when the sniff was occurring?

A. I was, but I was in -- I was in such a state of -- I was feeling all kind of emotions at that time. My children are in the back seat, so I was trying to process a lot of how I was feeling. I was in pure shock, and I was in pure fear, you know. I can't -- I can't answer that one.

Q. So you can't recall one way or the other if you were watching the dog?

A. I was watching, but I was also watching all of my surroundings, you know. It's officers everywhere, so I was watching, but I wasn't peering, like, yes, sir.

Q. Okay. Do you have any past -- I know you mentioned that right now you're studying, I think you said, for criminal justice.

A. Yes, sir.

Q. Have you got any prior experience or training related to narcotics detection?

A. No, sir.

Q. Okay. Have you ever trained a detection dog?
A. No, sir.
Q. So, safe to say that you, at the time of the stop, were not familiar with a dog's detection alert behavior?
A. No, sir. I wasn't aware of my rights either.
Q. I understand. And what I'm trying to focus on is just the facts about what you recall.
A. Yes, sir. Yes, sir. No. No, I can't say that.
Q. So at the time of the stop, is it safe to say that you would not know how a trained handler would interpret a dog alert?
A. That is safe to say.
Q. Okay. I believe you stated earlier when you walked through kind of what you recalled about the stop itself, that after the alleged dog alert, that drugs were discovered in the vehicle?
A. Yes, sir.
Q. Okay. And those drugs were in the car that you were driving?
A. Yes, sir.
Q. And as I understand it from the case report, there were two pills and a white substance found inside a purse.

A. Yes, sir.

Q. And also that your bank card was found inside that purse?

A. Yes, sir.

Q. And that purse was inside the car that you were driving?

A. Yes, sir.

Q. Did you see anyone place the drugs in the purse?

A. No, sir.

Q. And again, as I understand it, you were arrested after those drugs were located?

A. Yes, sir.

Q. And you were charged with drug possession?

A. I was charged with felony possession of methamphetamine, felony possession of oxycodone, and the tint violation, initially.

Q. And those charges were dismissed by the prosecutor; correct?

A. Yes, sir.

Q. Do you believe that any of the deputies had a desire to see you arrested?

A. I can't answer that.

Q. Had you met any of those deputies, or did you know any of them that were involved in that stop that

day?
A. No, sir.
Q. Did any deputy make any threats towards you that day?
A. No, sir.
Q. Do you have any facts or reason to believe that any of those deputies had a personal grudge against you?
A. No, sir.
Q. Are you aware of any facts or any evidence or information that would suggest any of these deputies had acted towards you with malice?
A. I can't answer that.
Q. I want to step back for a second, Ms. Walker, and kind of talk about afterwards.
A. Okay.
Q. I know that you were taken to the detention center and remained there for two days until your family was able to post bond. After this incident, did you seek any medical treatment?
A. No, sir. I'm already suffering from depression and anxiety, which I had already been on medication years prior to.
Q. So let me ask you a little bit about that. Had you been diagnosed by a physician with depression,

anxiety, or anything else prior to this incident?
A. Yes, sir. And also -- yes, sir.
Q. Do you recall who the physician was that you treated with or diagnosed you for those conditions?
A. Yes, sir. Dr. Iman Kaldas.
Q. By chance, do you know how to spell Kaldas?
A. Yes, sir. It's K-A-L-D-A-S.
Q. Thank you. Do you know, is Dr. Kaldas a part of a group or a practice, or -- is it a he or a she?
A. It's a she.
Q. Is she a part of a practice or a group, or is she on her own?
A. No, sir. She's a part of Piedmont.
Q. Do you recall when the last time was that you saw Dr. Kaldas?
A. I see -- as we're standing today, I see Dr. Kaldas every three months. So it would -- last time, I saw a colleague of hers on December 22nd, I do believe.
Q. And that was last year, 2025?
A. Yes, sir.
Q. Okay. Have you been seeing Dr. Kaldas or Dr. Kaldas' partner every three months since the time of this incident?
A. Yes, sir.
Q. Prior to this incident --

A. Yes, sir.

Q. If you'll let me finish the question, Ms. Walker.

A. I'm sorry.

Q. You know where I'm going, and I know what you're answering, but I want to make sure we've got it complete.

Prior to this stop and arrest, were you seeing Dr. Kaldas' office every three months?

A. Yes, sir.

Q. So there was no change in your pattern of treatment before and after this incident as far as visits every three months?

A. No, sir.

Q. You mentioned that you're taking medications related to the conditions.

A. Yes, sir.

Q. And just to make sure I've got it, that was depression, anxiety. Was there anything else?

A. Yes, sir. Sciatic nerve pain, Crohn's disease.

Q. And were you diagnosed with the sciatic nerve pain and the Crohn's disease before this stop?

A. Yes, sir.

Q. Have you been taking regular medication for

these various ailments?

A. Yes, sir.

Q. Were you taking them prior to this stop?

A. Yes, sir.

Q. Have there been any new medications that you have taken since this stop related to any of these conditions?

A. She's changed the brand, but there's no new diagnosis, should I say, but just a different brand.

Q. So, safe to say you're taking the same medications, maybe just a different brand?

A. Yes, sir. That's safe to say.

Q. And that was from before the stop and since the stop?

A. Yes, sir.

Q. I know that you shared with me earlier that since 2014 you haven't had a full-time job. I know you've been a student. Safe to say that you don't have any lost wages associated with this two days you were in the detention center?

A. Yeah, I do have lost wages when you have to pay people back for the bond.

Q. And, I guess --

A. But as far as working, no.

Q. So you didn't have any wages that you should

have been paid by an employee?

A. No, no. Thank you for rephrasing that.

Q. And I understand what you're getting at. Did you have childcare expenses related to those two days?

A. Yes, sir. Childcare. I mean, me being on fixed income. I'm a Social Security recipient. You know, the bond was two months of my check.

Q. Did you receive that back when the --

A. No, sir.

Q. -- charges were dismissed? Okay. And who was that bond paid to?

A. I can't recall offhand, but they're located on Peach Orchard Road across from a Family Dollar and a grocery store. It's next door to Piedmont.

Q. But that's a bonding company right there?

A. Yes, sir.

Q. Okay. Are there any other specific dollar amounts that you feel you have incurred that's related to this stop? We've talked about the bond, the childcare. Any other specific expenses, dollar amounts?

A. I can't answer that.

Q. Okay. Earlier, Ms. Walker, you mentioned that, you know, Deputy Morton told you the reason that he pulled you over at the beginning of the stop was for

tint.

A. Yes, sir.

Q. Do you have any evidence that this was not the reason that you were pulled over?

A. I can't answer that. No, I can't answer that. No, I don't have any evidence of that.

Q. And I believe you've already answered this, I apologize for that, but do you have any evidence that the dog did not alert?

A. A three-second body cam clip that I was originally given, other than that, I can't say.

Q. And so that would be the lack of body camera footage showing the alert. Is that what you're referring to?

A. Yes, because I myself didn't see the dog, but I'm not a trained canine handler.

Q. And so what I'm asking is just if there's any evidence that you want to share with me I need to be aware of that specifically states that the dog did not alert.

A. Not at this time, no.

MR. DUNAWAY: We've been in here about 45 minutes.

THE WITNESS: Really.

MR. DUNAWAY: Why don't we take a break. We

can go off for the record.

[Brief recess]

MR. DUNAWAY: Ms. Walker, I've got what we're going to mark as Exhibit 2. It's a thumb drive.

THE WITNESS: Okay.

MR. DUNAWAY: It's got two of the videos on them. I've also put the two videos on this thumb drive for you.

THE WITNESS: Yes, sir.

MR. DUNAWAY: These are two of the ones that we produced --

THE WITNESS: Yes, sir.

MR. DUNAWAY: -- in response to your discovery.

Q. [Mr. Dunaway] And, Ms. Walker, I know the answer before I ask, but you've reviewed the body cam videos.

A. Unfortunately, yes.

Q. And what I'm going to do as I start them, I think I've got the ability, if it works, to pause them, and we can look at times and things of that nature.

A. Yes, sir.

[Portion of body cam video is played.]

Q. And, Ms. Walker, if you'll look in the bottom left corner of the video that's on the screen.

A. Uh-huh.
Q. That says Deputy Michael Morton 9-13-2023 at 15:27 and six seconds.
A. Yes, sir.
Q. And just for the record, this is excerpt number 21 from the production that we provided to you.
A. Yes, sir.
Q. And what I'd like to do is let it play through the first couple of minutes, and then we'll back up --
A. Okay.
Q. -- and we can talk about it.
[Portion of body cam video is played.]
Q. And, Ms. Walker, I want to make sure what I just heard in the video -- and this is at 15:27:53 seconds.
A. Yes, sir.
Q. Was Deputy Morton identifying a white vehicle that he was stopping for window tint
A. Uh-huh.
Q. Do you agree with that?
A. Yes, sir, I do.
[Portion of body cam video is played.]
Q. And is that the white Grand Marquis that you were driving?
A. Yes sir.

Q. Okay. And if you look at that, does it appear to have tint on the back window?
A. Yes sir.
Q. Okay.
[Portion of body cam video is played.]
Q. And at this point it's at 15:28 and two seconds.
A. Uh-huh.
Q. Would you -- do you see that the passenger -- excuse me, the driver's side windows are tinted?
A. Yes sir.
[Portion of body cam video is played.]
Q. And so now I've paused at 15:28 and 11 seconds.
A. Uh-huh.
Q. And did the deputy just tell you that the reason he stopped you was for window tint?
A. Yes sir.
Q. And is that you in the driver's side?
A. Yes sir.
Q. Okay. And he asked you, I believe, if you knew what the tint was?
A. Yes sir.
Q. And you responded that you did not?
A. Yes sir.

[Portion of body cam video is played.]

Q. And at this point, 15:28 and 28 seconds, the deputy had just asked you for your driver's license; correct?

A. Uh-huh, yes, sir.

Q. And you provided it to him; is that correct?

A. Yes sir.

Q. And the video shows Deputy Morton returning to his vehicle?

A. Yes sir.

Q. And you see that there's another deputy already on the scene?

A. Yes sir.

Q. Okay.

[Portion of body cam video is played.]

Q. And I paused it now at 15:28 and 39 seconds. Do you see another deputy vehicle?

A. Yes sir. I'm sorry.

MR. DUNAWAY: We can go off the record.

[Recess, 2:20 p.m. to 2:29 p.m.]

Q. [Mr. Dunaway] And, Ms. Walker, I'd just asked you, I believe, at this current spot in the video, 15:28:39 from Deputy Morton's body cam, we can see two other vehicles; is that correct?

A. Yes sir.

Q. Okay.

[Portion of body cam video is played.]

Q. I went too far back.

A. No, you're fine.

[Portion of body cam video is played.]

Q. And, Ms. Walker, I see that you're making notes on the time as well. I want to see that we match up. I had that based on Deputy Morton's body cam that he exited his vehicle at the initial stop at 15:27 and 46 seconds. Does that sound correct?

A. Yes, when he exited his vehicle.

Q. And that was at the beginning of the traffic stop.

A. Um --

Q. And if you want, I can back it up so we can make sure.

A. Yes, sir.

[Portion of body cam video is played.]

Q. And I know we're a little past, but if you look at the time stamp on Deputy Morton's body cam, it shows 15:27 --

A. Fifty-six.

Q. It looks like 56 when he's exiting the car.

A. Yes, sir.

Q. And you'd agree that's at the beginning of the

stop.
A. Yes, sir.
Q. Okay.
[Portion of body cam video is played.]
Q. All right. And at 15:28 and 40 seconds, did you just hear Deputy Morton on his body cam ask the other deputy if he can ask for consent?
A. No, I did not.
[Portion of body cam video is played.]
A. I did, yes, sir.
Q. Okay. And so at 15:28 around 40 seconds, Deputy Morton had asked one of the other deputies if he can ask for consent.
A. Yes, sir.
[Portion of body cam video is played.]
Q. Okay. And at this point, Ms. Walker, I'm just going to allow it to play.
A. Yes, sir.
Q. But would you agree at this point around 15:29 that Deputy Morton is sitting in his patrol car?
A. Yes, sir.
Q. And if you will, Ms. Walker, do you see the gap between the door and the door frame on his vehicle?
A. Yes, sir.
Q. If you'll watch there, I'm expecting a deputy

to come into view.

A. Yes, sir.

[Portion of body cam video is played.]

Q. And did you see the deputy?

A. Yes, sir.

Q. Do you know -- my understanding that's Deputy Hawkins. Do you know --

A. Yes, sir.

Q. And that is Deputy Hawkins?

A. Yes, sir. It's Deputy Joseph Hawkins.

Q. Okay. And did you see in his hand that he appeared to have a leash?

A. Yes.

Q. Okay. I'm going to let it play. And this is at 1529 and 59 seconds.

A. Yes, sir.

Q. And that's on Deputy Morton's body cam; is that correct?

A. Yes, sir.

[Portion of body cam video is played.]

Q. And do you see Deputy Hawkins now to the right side of the video?

A. Yes, sir.

Q. Okay. And that's at 15:30 and four seconds; is that correct?

A. Yes, sir.

[Portion of body cam video is played.]

Q. Okay. And I apologize. I'm going to back it up because the -- was blocking the screen. But what I believe we see right here is the actual Deputy Hawkins with the canine.

A. Yes, sir.

Q. Gajas.

[Portion of body cam video is played.]

Q. And so at 15:30 and around 19 seconds, did you see the canine with Deputy Hawkins come back by?

A. Yes.

Q. And was the canine coming from the right passenger side of the Grand Marquis?

A. Yes, sir.

Q. So looking at our timeline, it's safe to say that the other deputies were on the scene within a minute or so.

A. Yes, sir.

Q. And that's of the actual traffic stop.

A. Yes, sir.

Q. And from what we just saw, do you recall that to have been the dog sniff that occurred?

A. Allegedly, yes, sir. Yes, sir.

Q. I understand. But at around 15:30 on Deputy

Morton's body cam did it appear to show the dog coming from the passenger side of the vehicle and back around.

A. Yes, sir.

Q. Okay. So do you have any reason to disagree that the dog sniff occurred within two minutes of the actual traffic stop beginning?

A. I don't.

Q. And at the time, about two minutes after when we saw the dog in the video, was Deputy Morton still in his patrol car?

A. Yes, sir. Up until --

Q. When he exited his vehicle right here at 15:30 --

A. Yes, sir.

Q. -- and 19 seconds.

A. Yes, sir.

Q. Prior to this point, had Deputy Morton at any point come back to your vehicle?

A. No, sir.

Q. Okay. So from the moment he got your license and went back to his patrol car until he exited after the dog came around the vehicle, he did not approach the vehicle.

A. No, sir.

Q. Okay. So he obviously had not returned your

driver's license to you.

A. No, sir.

Q. Okay. So would you agree that Deputy Morton was in his patrol car with your license still conducting the traffic investigation? And Deputy Morton.

A. I can't answer that. I can't agree or disagree.

Q. At any point during the video that we watched up until this point, have you heard Deputy Morton mention anything about investigating drugs?

A. I heard him tell Corporal Mealing to watch her, watch him -- watch him. I don't know what he said verbatim, but it was something about so someone doesn't hand something or something to that nature. I'm not --

Q. And that that was when he was seated in his --

A. In his vehicle.

Q. -- in his vehicle. Okay. At the time of the initial stop when you gave him your license, I believe you testified and we heard that he said he stopped you for a tint violation; is that correct?

A. Yes, sir.

Q. At any point did he say anything at that time about investigating drugs?

A. No, sir.

Q. And we heard from the video that you responded that you did not know what the tint was.
A. Yes, sir.
Q. And that's that you did not -- you agree that you did not know what the tint was. You're not saying that you knew what the tint was.
A. Yes, sir. Yes, sir.
Q. All right, Ms. Walker. I'm now going to show you just a small portion. This is -- if you look, it's excerpt number 26 coming across now. Richmond County Sheriff's Office 26.
A. Yes, sir.
Q. This is the number that was assigned to this when we produced the discovery to you.
A. Yes, sir.
[Portion of body cam video is played.]
Q. And if you look down in the bottom left-hand corner of this one, it says Corporal Bryan Mealing. It has 9-13-2023 and the time on this one says 14:47 and 31 seconds.
A. Yes, sir.
Q. Okay. And that's you right now in the video; is that correct?
A. Yes, sir.
[Portion of body cam video is played.]

Q. And I'm going to back it up, Ms. Walker. But at 14:48:42 on Corporal Mealing's body cam we see Deputy Hawkins with Gajas, the canine; is that correct?
A. Yes, sir.
[Portion of body cam video is played.]
Q. And so at 14:48 around the same time frame of 45 seconds, Corporal Mealing told you he's just going to walk the dog around the vehicle; is that correct?
A. Yes, sir.
Q. And then he said we've got to keep the dogs trained up.
A. He said we have to do it every now and again. Got to keep the dogs trained up.
Q. Okay. And I want you to watch now as I start playing. I want to watch yourself. Okay.
[Portion of body cam video is played.]
Q. And I'm going to back it up because of this.
[Portion of body cam video is played.]
Q. So would you agree with me that during the time that the dog was walking around the vehicle, that you were looking forward?
A. No, because I was looking in the mirror.
Q. Okay. So were you able to see what the dog's reaction was?
A. No, I can't. I can't say that.

Q. Okay. And as you mentioned earlier, the dog was on the passenger side of the vehicle in the middle area; is that correct?

A. As best as I can recollect from my memory.

Q. Okay. Would you agree that's what this video from Deputy Mealing's body cam showed, that the dog was on the passenger side of the vehicle?

A. Yes, sir.

Q. Mr. Walker, would you agree with me -- we talked about that Deputy Hawkins body cam does not show an alert. But would you agree with me that the absence of body cam video does not mean that an alert did not occur?

A. Could you rephrase that?

Q. Yes, ma'am. Would you agree with me that the absence of body cam video showing an alert does not mean that an alert did not occur?

A. I can't say that.

Q. Okay.

MR. DUNAWAY: And, Ms. Walker, that is the thumb drive I mentioned that has those two excerpts.

THE WITNESS: Thank you so much.

MR. DUNAWAY: We can mark this as Exhibit 2.

[Defendant's Exhibit Number 2 is marked for

identification.]

Q. [Mr. Dunaway] Ms. Walker, I want to talk with you briefly a little bit about the canine itself. I know that you've alleged that in your complaint that the canine Gajas was not certified; is that correct?

A. Yes, sir.

Q. All right. I'd like to show you what I'm marking as Defendant's Exhibit 3.

[Defendant's Exhibit Number 3 is marked for identification.]

Q. And if you look in the bottom corner -- this is a copy for you -- you'll see that this has got Bates stamp number RCSO16. And then page two has number 17 on it.

A. Yes, sir.

Q. These are documents that we produced in response to your discovery requests. I'll give you the original.

A. Yes, sir.

Q. This is the original. That's a copy for you to keep.

A. Okay.

Q. If you look at the first page of this Exhibit 3, do you see at the top -- and it took me a while to get the pronunciation down correctly. But it's

actually pronounced Gajas. Do you see that this has working dog Gajas at the top?

A. Yes, sir, I do.

Q. And if you look down a few lines, do you see where it says assigned handler's name, Joseph Hawkins, Junior, Richmond County Sheriff's Office.

A. Yes, sir, I do.

Q. Okay. And if you look up to the third line detection odor, it says marijuana, cocaine, crack cocaine, heroin, meth, black tar heroin.

A. Yes, sir.

Q. Okay. Do you see the directly below that where it says certification rate, pass?

A. Yes, sir.

Q. And do you see directly below Deputy Hawkins' name says I certified this document true and correct as of November 28, 2022?

A. Yes, sir.

Q. Okay. And then if you will look down below the two signatures of the instructors, do you see where it says note, this certification is valid for a period of one year from the date -- the above date?

A. Yes, sir.

Q. Okay. So if you look at the top, this is a document from the Chatham County Regional K-9 Resource

Team at the Georgia K-9 Training Facility; is that correct?
A. Yes, sir.
Q. And directly below the address, it says working dog certification?
A. Yes, sir, I see that.
Q. So would you agree with me that based on this document, Gajas with an assigned handler of Deputy Hawkins was certified for a period of one year from November 28, 2022, for detection odor that included marijuana and meth?
A. I do see that, yes, sir.
Q. Okay. And again, the date of this was November 28, 2022; is that correct?
A. Yes, sir.
Q. So that would mean for one year, it would have encompassed September 13 of 2023.
A. Yes, sir.
Q. Okay. And that was the date of your traffic stop?
A. Yes, sir.
Q. And if you look at the second page, this is a United States Police K-9 Association Inc. certificate of certification; is that correct?
A. Yes, sir.

Q. And this one is dated February 25th of 2023.
A. Yes, sir.
Q. And it certifies that Joseph Hawkins and their police dog Gajas has been tested under the standards set forth by the United States Police K-9 Association and have achieved the desired rating of excellence therein.
A. Yes, sir.
Q. Okay.
A. And this is my copy and this is the original?
Q. And if you -- we'll give the original back to the court reporter. Thank you.
Ms. Walker --
A. Yes, sir.
Q. -- we've just looked at these certificates and the first one appears to indicate that the drug dog Gajas and Deputy Hawkins were certified on the date of this stop. Would you agree with that?
A. Yes, sir.
Q. Do you have any evidence that either Deputy Hawkins or Gajas were not certified on the date of this traffic stop?
A. I don't.
Q. Ms. Walker, we've talked about this a little bit. But as I understand it, you do not dispute that

drugs were actually found in the vehicle you were driving.
A. I don't.
Q. Okay. And you are aware that there was a white substance found inside the purse that had your bank card in it.
A. Yes, sir.
Q. Okay. Are you aware that that that white substance field-tested positive for methamphetamine?
A. Yes, sir.
Q. Do you have any evidence or any facts to dispute that field test that was positive for methamphetamines?
A. No, sir.
Q. Do you have anything, any evidence or any facts to show that that field test was fabricated?
A. No, sir.
Q. Do you have any evidence or facts to show that that methamphetamine was misidentified?
A. I do not.
Q. So, going back to the video that we just watched -- and I believe you've already shared this with us, but you do not dispute that the windows on the vehicle were tinted after seeing the video?
A. I can't answer that. I can't. I can't.

I can't answer that.

Q. Would you agree that the windows were tinted on the vehicle?

A. I can't answer it. I can't. I can't answer that because I don't know if they were manufactured tint or, you know, custom.

Q. And, Ms. Walker, I'm not asking you whether it was manufacturer tint or if it was after applied custom tint. I'm just asking, would you agree that the windows were tinted, whether it was manufacturer or whether it was after from the windows in the video we saw that showed them?

A. I can't answer it.

Q. Okay. Ms. Walker, in this case, you have also made a claim against the sheriff, Sheriff Brantley. Would you agree that Sheriff Brantley in 2023 was not personally involved as the sheriff --

A. Yes, sir.

Q. -- for this stop? Okay. So you are suing the sheriff in his official capacity; is that correct?

A. Yes, sir.

Q. What is it that you contend that Sheriff Brantley did improperly?

A. Failure to reform these officers or -- I can't -- I can't answer that. But nothing's changed.

Q. So are you aware of any written policy or procedure that a deputy failed to follow in your case?

A. Yes, sir.

Q. What is that?

A. GBI lab testing of loose prescription pills. They were -- he used Drugs.com to identify loose pills that were in a bottle or a prescription, you know, label packaged. He used Google and he went on Drugs.com to identify them.

Q. Okay. So one of the policies or customs that you contend that a deputy either failed to follow or shouldn't follow was using Pills.com [sic] as it relates to the oxycodone pills.

A. Yes, sir.

Q. Okay. So you understand that the GBI lab had to be sent the pills to be tested; correct?

A. Right. Yes, sir.

Q. Thank you. And you understand that that takes some time period, whether it's a few days to occur.

A. Yes, sir.

Q. So you'd agree that the GBI crime lab can't test pills at the side of a road --

A. Yes, sir.

Q. -- during a traffic stop?

A. Yes, sir. Yes, sir.

Q. Thank you. Are there any other policies or procedures that a deputy failed to follow?

A. I can't. Not at this moment, I can't answer that.

Q. Other than -- I believe it was Deputy Morton; is that correct --

A. Yes, sir.

Q. -- that used Pills.com?

A. Yes, sir.

Q. Other than his use of Pills.com to identify the two pills that he stated were oxycodone, is there any other written policy or custom that you contend is unconstitutional?

A. Yes, which would be approximately 20 grams of marijuana. And on the chain of custody, you're classifying it as a felony, but in the state of Georgia, a felony is 28 grams or more. But also on the K-9 report, it contradicts that report because it alleges 10 grams.

Q. So the K-9 report said it was 10 grams of marijuana; correct.

A. Yes, sir.

Q. And the case report said it was 20 grams of marijuana.

A. Approximately, yes, sir.

Q. So you'd agree that both of those would be a misdemeanor.

A. Yes, sir.

Q. And so is it your contention that somewhere you were charged with a felony related to the marijuana?

A. On the chain of custody report, it was classified as a felony. Yes, sir.

Q. Okay. Were you charged with a felony as it was related to the marijuana possession?

A. I wasn't charged with marijuana initially at all. I didn't bond out on marijuana. It wasn't on my bracelet during. I wasn't -- I wasn't even aware of marijuana.

Q. And my understanding was that you were not charged with any charges related to the marijuana.

A. Initially.

Q. Initially.

A. Yes, sir.

Q. Okay. And after you bonded out, as I understand it, you were indicted by the district attorney; is that correct?

A. Yes, sir.

Q. And that was on four charges; correct?

A. Yes, sir.

Q. And that was possession of methamphetamine felony.

A. Yes, sir.

Q. Possession of oxycodone felony.

A. Yes, sir.

Q. The window tint citation violation.

A. Yes, sir.

Q. And then possession of marijuana?

A. Yes, sir.

Q. Was that possession of marijuana charge, was it a misdemeanor?

A. Yes, sir.

Q. So no one actually charged you with a felony related to the amount of the drugs, the marijuana that was found?

A. No, sir. I was -- I was not. No, sir.

Q. Okay. So I understand that we've talked about the discrepancy in the amounts in the K-9 report and in the case report --

A. Yes, sir.

Q. -- for the marijuana. We have talked about the use of Pills.com to determine what type of pills they were by Deputy Morton.

A. Yes, sir.

Q. Are you aware of any training that Deputy

Morton has as it involved narcotics investigation?
A. I can't answer that right now.
Q. And I'm just asking your personal knowledge. Do you --
A. Personally, I don't know Deputy Morton.
Q. Okay. Are you aware of what training deputies receive that are on road patrol as it relates to investigation of narcotics or identification of narcotics?
A. I've done slight research, yes, sir.
Q. And so what can you tell me about the training or the -- related to narcotics and identification the Richmond County Sheriff's Office deputies receive?
A. I cannot answer that right now.
Q. Okay. Do you have any evidence of previous misidentification of drugs about Deputy Morton?
A. I cannot answer that right now.
Q. Does that mean you don't know or you may be able to?
A. I don't know.
Q. And, again, I'm just trying to make sure I understand. When you say I don't know, does that mean you don't know of any prior incidents with Deputy Morton and misidentifying drugs?
A. I do not know Deputy Morton personally, no,

sir, so no.

Q. Do you know of any claims related to misidentification of drugs other than what we have in this case?

A. No, sir.

Q. And that's related to Deputy Morton.

A. No, sir, I do not.

Q. Are you aware of any previous claims against Deputy Hawkins alleging that he falsified canine alerts?

A. Yes. Yes, sir.

Q. Tell me about those.

A. I have read some other articles where someone else alleged that he fabricated the dog alert.

Q. Okay. Who was that person that alleged it?

A. I don't know personally. It was the Internet search. It was an Internet search from an article. Also --

Q. When did that occur?

A. I do not recall the year, date and time. I don't. But I do recall reading that.

Q. Do you recall what website you read that on?

A. I don't in this moment, but I can. It's documented in my files at home.

Q. Other than that one article, are you aware of

any other allegations of Deputy Hawkins falsifying canine alerts?

A. No, sir.

Q. And you say that you do have the ability to get that article.

A. Yes, sir.

Q. And will that identify the person who made the claim?

A. If I'm not mistaken, yes, sir.

Q. Okay. Do you know what the outcome was of that allegation?

A. No, sir.

Q. And do you recall was this like a newspaper article or something like that or was it just like a message board post?

A. No, it wasn't a message board.

Q. Where do you think it was posted?

A. I can't recall at this moment. I cannot recall at this moment.

Q. Are you aware of any other lawsuits that have been asserted against the sheriff involving falsifying canine alerts or misidentification of drugs?

A. I'm not aware.

Q. Are you aware of any other complaints other than the one that we just discussed involving

falsification of canine alerts or misidentification of drugs?

A. With Sheriff Brantley?

Q. With the Richmond County Sheriff's Office/ Sheriff Brantley?

A. I can't say at this moment, no.

Q. Do you have any evidence that the sheriff knew the deputies were engaging in the conduct that you're alleging?

A. No, sir.

Q. Can you identify any prior complaints about falsified reportings that were ignored by the sheriff?

A. Not on my behalf, no, sir.

MR. DUNAWAY: If we could take just a second, Ms. Walker, I think I'm almost done.

THE WITNESS: Yes, sir.

MR. DUNAWAY: Can I get anybody anything?

THE WITNESS: No, sir. I'm fine.

[Recess 3:09 p.m. to 3:17 p.m]

Q. Ms. Walker, this is just to make sure -- I apologize if I'm asking things you've already answered. So I understand that with the initial stop that the canine was there pretty quick.

A. Yes, sir.

Q. Is there anything that you can point to that

the officers did -- the officers did to prolong the stop for the dog to arrive?

A. I can't answer that at this moment.

Q. And --

A. I'm sorry. I'm having a discrepancy. My daughter got called into work.

MR. DUNAWAY: Let's go off the record for a second.

[Off the record momentarily]

Q. Ms. Walker, I understand. We've been dealing with some things here. So just real quick. What I was just asking you about is, from your testimony today, I understand that within a matter of a minute or two of the traffic stop occurring, that the K-9 unit was on site.

A. Yes, sir

Q. And that within a minute or two that the K-9 conducted the dog sniff.

A. Yes, sir.

Q. And that you're not aware of anything that the officers did to prolong the traffic stop for the dog to arrive because the dog was there so quick?

A. I can't answer that.

Q. Okay. But you'd agree that the dog was there and performed the sniff within a minute or two of the

stop.

A. Yes, sir.

Q. Do you have any personal knowledge regarding the training deputies receive regarding traffic stops?

A. I can't. I can't answer that.

Q. You can't answer that or you don't know?

A. I don't know.

Q. And this is -- I'm asking you if you have personal knowledge.

A. No, no.

Q. Okay. Do you have any personal knowledge of the training the deputies receive regarding K-9 deployments?

A. No.

Q. Okay. And other than the one incident/incidents we discussed that you found on the Internet involving Deputy Hawkins and the alleged falsification of a dog alert, you're not aware of any complaints or lawsuits involving similar conduct of falsification of K-9 alerts.

A. No, sir.

Q. Okay. And as I understand it from your earlier testimony, other than your occurrence here, what we're here on today, you're not aware of any other complaints or lawsuits against Deputy Morton or

involving the Sheriff's Office regarding the use of Pills.com to identify drugs.

A. No, sir.

Q. And other than what we discussed about the use of Pills.com, are you aware of any other written policies or written customs or procedures of the Sheriff's Office that violated your constitutional rights?

A. Not at this time. It's not at this time, this moment.

Q. And you don't have any evidence that the sheriff personally knew about any of the conduct that you're alleging?

A. No, sir.

Q. Are you aware of any training or written policies that encourage deputies to falsify reports or things of that nature?

A. No, I'm not.

Q. Okay.

MS. DUNAWAY: If you'll give me one second, Ms. Walker, I believe we're done.

Q. [Mr. Dunaway] Ms. Walker, other than the fact that the charges were dismissed, do you have any evidence that the officers lacked probable cause to search your vehicle?

A. Can you rephrase that?

Q. Yes, ma'am. So what I'm asking about is we know that the charges were dismissed.

A. Yes, sir.

Q. And so what I'm asking is, putting that aside --

A. Uh-huh.

Q. -- is there any other evidence that you have that the officers liked probable cause to search your vehicle?

A. I -- I don't have any evidence at this very moment in time.

MR. DUNAWAY: Okay. Ms. Walker, I believe that's all I have.

THE WITNESS: Okay.

MR. DUNAWAY: Thank you very much. We can go off the record.

**[Deposition concluded at 3:23 p.m.]**

[Signature is reserved by The Witness after conclusion of the deposition.]

\- - - - -

//

//

//

//

**DISCLOSURE**

**DEPONENT: TAMEKA LUCILLE WALKER**

STATE OF GEORGIA

COUNTY OF RICHMOND

Pursuant to Article 10.8 of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Pamela N. Pope, CCR, CVR-M.

Pamela N. Pope, CCR, CVR-M, was contacted by the offices of Hull Barrett, PC to provide court reporting services for this deposition. Pamela N. Pope, CCR, CVR-M, will not be taking this deposition under any contract that is prohibited by O.C.G.A. Section 15-14-37(a) and (b).

Pamela N. Pope, CCR, CVR-M, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Pamela N. Pope, CCR, CVR-M, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Dated: 03/11/26

Gina L. Smith, CCR, CVR-M, B-2151

**CERTIFICATE OF COURT REPORTER**

I hereby certify that the foregoing deposition was reported as stated in the caption, by the method of Stenomask, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages numbered 3 through 64 represent a true, correct, and complete transcript of the evidence given on March 11, 2026, by the witness, Tameka Lucille Walker, and that signature was reserved.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of Pamela N. Pope, CCR, CVR-M, and the signature and original seal is attached hereto.

I further certify that I am not related to or are of counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

This 24th day of March 2026.

Gina L. Smith

GINA L. SMITH, CCR, CVR-M
CERTIFIED COURT REPORTER
GEORGIA CERTIFICATE # B-2151

**ERRATA SHEET**

I, **Tameka Lucille Walker**, the witness herein, do hereby certify that I have read all questions propounded to me and all answers given by me on the 11th Day of March 2026, taken before Gina L. Smith, CCR, CVR-M, and that:

___ 1) There are no changes noted.

___ 2) the following changes are noted:

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

ERRATA SHEET (Continued)

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

Page ____ Line ____ should read: ______________________

Reason for change: ______________________

______________________________

**TAMEKA LUCILLE WALKER**

Sworn to and subscribed before me

on this ________day of __________, 2026.

______________________________

Notary Public

My commission expires: ____________